IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MINNESOTA LAWYERS MUTUAL :
INSURANCE COMPANY
    Plaintiff :
                              :
    vs.                          CIVIL NO. 1:CV-09-1661
                              :
THOMAS J. AHRENS, Esquire, :
AHRENS LAW FIRM, P.C.,
DAVID E. RICKER, RANDALL WAGNER,:
JOHN JARBOE, LARRY L. HATTER,
JAMES J. GREEN, SR., :
KEITH HOSTLER, ANGELA HICKEY,
ORREL E. PICKLESIMER, Executor :
of the Estate of Edsel Picklesimer,
MARK RANDALL, NEIL BARR, :
    Defendants

*M E M O R A N D U M*

I.    *Introduction*

        This is a diversity action controlled by Pennsylvania law. Plaintiff, Minnesota Lawyers Mutual Insurance Company (MLM), sought a declaratory judgment that it had no duty to defend or indemnify defendants, Thomas J. Ahrens, Esq., and his law firm, Ahrens Law Firm, P.C. ("the firm"), in two civil suits pending against them in the Court of Common Pleas of Cumberland County, Pennsylvania. On May 18, 2010, we granted the requested relief, deciding there was no coverage because of an exclusion for claims "arising out of the solicitation or sale of . . . specific investments." *Minnesota Lawyers Mut. Ins. Co. v. Ahrens*, 2010 WL 1994181, at *5-6 (M.D. Pa. May 18, 2010).

        The plaintiffs in the "*Wagner* action," one of the state-court actions, who were also named as defendants in this action, have filed a motion under Fed. R. Civ.

P. 59(e) to alter or amend the order.[1]  They request that we reverse our ruling, and order MLM to provide Ahrens and the firm with a defense of the *Wagner* action and to declare that MLM is at least conditionally required at this point to indemnify Ahrens and the firm for any judgment entered against them in the *Wagner* action.  For the reasons that follow, we will deny the motion.

II.  *Background*

    *A.  The Pertinent Policy Language*

MLM's policy basically insured Ahrens and the firm for legal malpractice.  The policy obligated MLM to cover losses suffered "arising out of any act, error or omission of the INSURED . . . resulting from the rendering or failing to render PROFESSIONAL SERVICES while engaged in the private practice of law . . . ."  (Doc. 28-2, CM/ECF p. 5, Am. Compl., Ex. A).[2]  In a circular way, the policy defines "professional services," in pertinent part, as "legal or notary services for others . . . ."  (*Id.*, p. 7).  The policy contains several exclusions.  One of those exclusions precludes coverage for "any CLAIM arising out of the solicitation or sale of specific securities or specific investments by any INSURED."  (*Id.*).

    B.  *The State-Court* Wagner *Action*

The *Wagner* action was filed to recover substantial sums of money, totaling some $8.7 million, that the nine plaintiffs in that action gave Ahrens.  The defendants in the state-court action are Ahrens and the firm.  The *Wagner* plaintiffs

---

[1] The *Wagner* plaintiffs (and defendants here) are Randall Wagner, John Jarboe, Larry L. Hatter, James J. Green, Sr., Keith Hostler, Angela Hickey, Orrel E. Picklesimer (executor of the estate of Edsel Picklesimer), Mark Randall and Neil Barr.

[2] Citations to the record are to the pages assigned by the electronic case management system.

allege the following in their state-court amended complaint, in pertinent part. The money was to be used for "'loans'" or "'investments'" with Alfred Madeira and Sean and Shalese Healy, husband and wife. (Doc. 28-4, Am. Compl. ¶ 4). The loans or investments were to be used to purchase gold futures and other commodities. (*Id.*).

The plaintiffs were already legal clients of Ahrens and the firm in some form, as the defendants had performed a variety of legal services for each of the plaintiffs: "drafting wills, trusts and powers of attorney; forming businesses; serving as corporate counsel; representing estates; bringing and defending litigation and other general legal services." (*Id.* ¶ 20). The plaintiffs believed they were in an attorney-client relationship at the times the state-court defendants presented them with "what was described as an attractive moneymaking opportunity" with Madeira and the Healys that would provide "an extraordinarily high rate of return with no risk." (Doc. 28-4, pp. 7-8 ¶¶ 22-23, 26, 29). "Defendants promised rates of return between 20% and 150% within a few months and guaranteed that, at worst, Plaintiffs' principal would be returned in full." (*Id.* ¶ 27). Based on Defendants' representations, and Ahrens' "heightened credibility as a respected attorney who had provided legal counsel to each Plaintiff," the plaintiffs "provided funds to Ahrens, Law Firm, Madiera, and/or Mrs. Healy in the following amounts":

| | |
|---|---|
| Larry Hatter | $1,700,000 |
| Randall Wagner | 1,645,700 |
| John Jarboe | 1,645,700 |
| James Green | 1,550,000 |
| Keith Hostler | 800,000 |
| Angela Hickey | 500,000 |
| Picklesimer Estate | 355,000 |
| Mark Randall | 300,000 |
| Neil Barr | 225,000 |
| Total | $8,721,400 |

(*Id.* ¶ 29).

3

The defendants failed to disclose that they expected compensation from Madeira and the Healys of about $8.7 million for legal services performed for those individuals. (*Id.* ¶ 31). "After the funds were provided by the Plaintiffs, the Defendants continually reported the tremendous financial results to Plaintiffs and further represented to each of them that Plaintiffs should expect to receive far more than each Plaintiff initially provided." (*Id.* ¶ 32). However, Plaintiffs have received "no funds" despite the representations concerning "the use of their funds, the expected repayment dates and the performances of the loans and investments." (*Id.* ¶ 33).

The state-court pleading makes the following pertinent allegations concerning each of the plaintiffs. In August 2008, Ahrens contacted Randall Wagner and John Jarboe about "an attractive moneymaking opportunity" that "could achieve an extraordinarily high rate of return with no risk." (*Id.* ¶ 38). In October 2008, this involved a loan to Madeira so that he could buy a "gold futures contract" with a return of 50% on the "amount loaned" if gold closed at a certain price "on any day between the date of the contract and February 1, 2009." (*Id.* ¶ 43). If not, they "would receive a full repayment of the loan without any interest." (*Id.*). A second proposal for $700,000 was made shortly thereafter. (*Id.* ¶ 44). Wagner and Jarboe "initially provided $1,550,000" by wiring the money to Ahrens' attorney escrow account, (*id.* ¶¶ 47 and 48), and eventually "provided a total of $3,291,400 to Ahrens, Madeira and/or Healy . . . ." (*Id.* ¶ 55).

In October 2008, plaintiff Hatter met with Ahrens, who explained that Sean Healy "invested in gold and oil" and "bought contracts from failing banks and if the commodity hit a certain price by a certain date, the premium would be paid." (*Id.* ¶ 64 and 65). Hatter "initially provided . . . $400,000" in October 2008 and eventually "provided $1,850,000 to Ahrens, Madiera and/or Healy." (*Id.* ¶¶ 68 and 71).

4

In October 2008, Ahrens told plaintiff Green about "a business opportunity whereby Green could make a great deal of money . . . ." (*Id.* ¶ 81). "Green provided a total of $1,550,000 to Ahrens." (*Id.* ¶ 84).

In October 2008, Ahrens told plaintiff Hostler "of a business opportunity" whereby Hostler was "guaranteed to get his money back." (*Id.* ¶ 90). Hostler "provided a total of $800,000 that ultimately was provided to Mrs. Healy." (*Id.* ¶ 92).

In October 2008, Ahrens called plaintiff Hickey and offered her "a financial opportunity" with "a return of 20%" for her loan of money to Ahrens. He also offered her "the ability to lend money to Madeira for a 100% return." (*Id.* ¶¶ 102 and 103). "Hickey thereafter provided a total of $500,000 to Ahrens." (*Id.* ¶ 104).

In October 2008, the Estate of Orrel Picklesimer agreed to lend money to Madeira for six months at a 20% annual rate and eventually $355,000 was transferred from the Estate's account. This happened after the beneficiary of the estate was told by a representative of the firm "of an investment that was guaranteed to provide a 20% return." (*Id.* ¶¶ 114, 115 and 117).

In October 2008, Ahrens told plaintiff Mark Randall about "an opportunity to make 'a remarkable return' of 50% based upon gold futures contracts." (*Id.* ¶ 125). Randall "provided a total of $300,000," and in February 2009, Ahrens told him he could expect $450,000 shortly. (*Id.* ¶¶ 127-28).

"In September, 2008, Ahrens contacted plaintiff Barr and told him Madeira was trading in gold" and had made $80,000,000. (*Id.* ¶ 135). Ahrens asked him if he wanted to participate as well. Barr at first resisted, but after Ahrens said there was enough funds to guarantee no loss to Barr, "Barr provided a total of $225,000 to Ahrens." (*Id.* ¶ 140).

The *Wagner* plaintiffs each make three claims against Ahrens and the firm: (1) a claim for professional negligence; (2) a claim for negligent misrepresentation; and (3) a claim for breach of fiduciary duty.

On the claim of professional negligence, they allege, among other things, that defendants Ahrens and the firm committed legal malpractice in the following ways. First, they "failed to investigate whether Mr. and Mrs. Healy were licensed brokers, whether they actually were purchasing gold futures and, if so, what the actual results had been." (*Id.* ¶ 148(a)). Second, they failed to disclose that they were really representing Madiera rather than the plaintiffs when Madiera had a conflict of interest with the plaintiffs because he was borrowing their funds. (*Id.* ¶ 148(d)). On the claim of negligent misrepresentation, they allege, among other things, that defendants negligently misrepresented that: (a) the "loan and/or investment of the funds provided by Plaintiffs to Defendants carried no risk and the principal was guaranteed to be returned" and that "Madiera had assets sufficient to cover any loss the Plaintiffs might incur from these loans or investments."  (*Id.* ¶ 153© and (e)). On the claim of breach of fiduciary duty, the *Wagner* plaintiffs allege that the defendants breached that duty when they "failed to adequately investigate the loans and investments that they induced Plaintiffs to enter into, failed to counsel Plaintiffs accordingly and failed to receive and distribute Plaintiffs' funds appropriately." (*Id.* ¶ 160). The defendants also redirected Plaintiffs' funds to parties other than Mr. and Mrs. Healy or Madiera without notifying Plaintiffs. (*Id.* ¶ 161).

III.     *Discussion*

    A.     *The Court Did Not Err in Sua Sponte Granting
a Declaratory Judgment for MLM*

The defendants (the plaintiffs in the *Wagner* action) first argue that we committed a clear error of law by sua sponte granting judgment on the pleadings in favor of MLM "without adhering to the strict requirements for doing so." (Doc. 49, Supp'n Br. at p. 4). In making this argument, the defendants recognize that we can enter judgment on the pleadings on our own motion, but that we can do so only when it is apparent from the pleadings, and only after accepting as true all the allegations of their complaint and drawing all inferences from those allegations in their favor.

The defendants have stated the correct legal standard, as their citation to *Bryson v. Brand Insulations, Inc.*, 621 F.2d 556 (3d Cir. 1980), makes clear. In that case, the Third Circuit stated that the "district court may on its own initiative enter an order dismissing the action provided that the complaint affords a sufficient basis for the court's action." *Id.* at 559. Additionally, "the plaintiff must be given the safeguard of having all its allegations taken as true and all inferences favorable to plaintiff drawn." *Id.* (quoted case and internal quotation marks omitted). Accordingly, the court of appeals confirmed that "for a court to grant judgment on the pleadings, sua sponte, is not error." *Id.* We disagree with the defendants' assertion that we did not follow this standard, as will be shown below.

Parenthetically, we do not ordinarily enter a judgment sua sponte. Our sua sponte judgment on the pleadings here stemmed from *the defendants' motion* for judgment on the pleadings, as well as from a motion for judgment on the pleadings filed by another defendant, David E. Ricker, the plaintiff in the other state-court action. Both motions, fully briefed, argued that the pleadings alone entitled the defendants' to

7

a judgment ordering MLM to defend and indemnify them in the underlying state-court actions. As we noted in the memorandum accompanying the May 18, 2010, order, the duty to defend (which can be dispositive of the duty to indemnify) is one decided solely from the pleadings in the underlying action. 2010 WL 1994181, at *1 and 3. While it is true that MLM did not file its own motion, it did request in its opposition briefs entry of judgment in its favor. In these circumstances, there was no error in entering judgment in MLM's favor on our own motion. *Cf. Anderson v. Wachovia Mortg. Corp.*, _ F.3d _, _, 2010 WL 3528903, at *15 (3d Cir. 2010) (sua sponte grant of summary judgment "is not the preferred method" but is not erroneous "when a case involves the presence of a fully developed record, the lack of prejudice, [and] a decision based on a purely legal issue.").

It still remains, however, that the defendants did not have notice of our intent to enter judgment on the pleadings before we did so. Hence we will evaluate the motion to alter or amend under the same standard employed to decide a motion for judgment on the pleadings, *see Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008), rather than the more restrictive standard for a motion to alter or amend.[3]

> B.   *The Loans to Madiera Were* Investments *as that Word Is Commonly Understood*

As noted, the policy excludes coverage for "any CLAIM arising out of the solicitation or sale of specific securities or specific investments by any INSURED." At

---

[3] The purpose of a motion to alter or amend is:

"to correct manifest errors of law or fact or to present newly discovered evidence." *Max's Seafood Café v. Quinteros,* 176 F.3d 669, 677 (3d Cir. 1999). A proper Rule 59(e) motion therefore must rely on one of three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error of law or prevent manifest injustice. *N. River Ins. Co. v. CIGNA Reinsurance Co.,* 52 F.3d 1194, 1218 (3d Cir. 1995).

*Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010).

issue here is whether the *Wagner* plaintiffs' claims are excluded because they arise from the solicitation or sale of specific investments by Ahrens. We decided that they were excluded because the loans were "investments" as commonly understood since the *Wagner* plaintiffs "expected[ ] to receive a return on the money they gave Ahrens." 2010 WL 1994181, at *5.

In arguing that the exclusion does not apply, the defendants contend that a loan is not necessarily an investment because, contrary to our conclusion, an investment is not a financial transaction in which the lender expects a return, as that term is commonly understood "by any number of courts." (Doc. 49, Supp'n Br. at p. 7). The defendants then cite *Lino v. City Investing Co.*, 487 F.2d 689 (3d Cir. 1973), *Bank of Am. Nat'l Trust & Sav. Co. v. Hotel Rittenhouse Associates*, 595 F. Supp. 800 (E.D. Pa. 1984), and *Tri-County State Bank v. Hertz*, 418 F. Supp. 332 (M.D. Pa. 1976), three cases dealing with whether certain financial instruments were securities covered under the federal securities laws. Moreover, the defendants contend that these cases teach "that the decision to characterize a loan as an investment is an intensely factual one that cannot be decided on the pleadings alone." (Doc. 49, Supp'n Br. at p. 9). The defendants maintain that if we had allowed them to proceed to summary judgment, rather than cut them off at the pleading stage, they would have introduced as evidence the notes between themselves and Madeira that would have shown that they had engaged in "loan transactions" and not investments, and this evidence would have been supplemented by their own testimony.

Defendants' argument is mistaken. When we decided that loans were investments as commonly understood, we were following Pennsylvania law. "Words of common usage in an insurance policy are construed according to their natural, plain, and ordinary sense," *Kvaerner Metals Div. v. Commercial Union Ins. Co.*, 589 Pa. 317,

9

332-33, 908 A.2d 888, 897 (2006), not by the way a court may define them for the purpose of a claim under a particular law. Further, under Pennsylvania law, the court "may consult the dictionary definition of a word to determine its ordinary usage." *Id.* at 333, 908 A.2d at 897. "Investment" is defined as "an expenditure of money for income or profit." Webster's Third New International Dictionary 1190 (1993). The defendants allege they were presented with "business opportunities" with "extraordinarily high rates of return" and that they then "provided" money expecting these returns, or at least a return of their principal. These allegations come within the definition of an investment since they were expenditures of money for income or profit.

The defendants are also mistaken in believing that the meaning of "investment" is a factual issue. In Pennsylvania, the interpretation of an insurance policy is a question of law. *Kvaerner Metals, supra*, 589 Pa. at 331, 908 A.2d at 897. Further, "an insurer's duty to defend and indemnify [is] determined solely from the language of the complaint against the insured." *Id.*, 908 A.2d at 896. *See also Sunoco, Inc. v. Illinois Nat'l Ins. Co.*, 226 F. App'x 104, 107 n.2 (3d Cir. 2007)(nonprecedential) (district court did not err in refusing to allow discovery on the issue of an insurer's duty to defend when that issue is determined under Pennsylvania law by looking solely "at the four corners of the complaint" in the underlying action).

The defendants next argue that we failed to take into account that the exclusion applies not just to investments but to "specific" investments. They maintain that the notes they would have introduced at summary judgment between themselves and Madeira establish that they "made a general loan of funds to Madiera" and that their testimony would have shown "that they were unaware of any specific ultimate purpose for them." (Doc. 49 Supp'n Br. at p. 10). The defendants add that they "certainly did not make a pledge of particular funds from a specific account," (*id.*), and

10

that all the terms in an insurance policy must be given effect, citing *TIG Specialty Ins. Co. v. Koken*, 855 A.2d 900, 914 (Pa. Commw. 2004).

We reject this position. We did not explicitly discuss the significance of the word "specific" because it was obvious that the defendants alleged they had made specific investments by the allegations they had "provided" specific amounts of money (doc. 28-4, Am. Compl. ¶ 29) upon being solicited by Ahrens' promise of a certain rate of return, or at worst, a return of their principal. It is irrelevant that they did not know how Madeira or the Healys would invest the money (even if we could consider this factual issue, which we may not, as established above). It is also irrelevant that they "did not make a pledge of particular funds from a specific account."

      C.    *The Defendants' Claims Arose Out of the Solicitation or Sale of Specific Investments by Ahrens and Hence Are Excluded From Coverage*

The *Wagner* plaintiffs' final argument is that we erred when we decided that their claims arose out of Ahrens' solicitation or sale of specific investments. They maintain their claims arose instead, as they allege, out of his negligence in failing to investigate the Healys and out of his negligent misrepresentations to them concerning the loans or investments they made to Ahrens and the firm. They further argue that Pennsylvania law requires MLM to defend a complaint making these allegations, even if it could be argued that the claims arose out of conduct excluded from coverage, that is, the solicitation or sale of specific investments. They rely on *Board of Public Educ. v. Nat'l Union Fire Ins. Co.*, 709 A.2d 910 (Pa. Super. 1998)(en banc), and *Coregis Ins. Co. v. City of Harrisburg*, No. 03-920, 2005 WL 2179734 (M.D. Pa. Sept. 9, 2005).

We disagree. Those cases are distinguishable as they both involved conduct of a third party alleged to have injured the plaintiff in the underlying action,

11

and separate conduct by the insured alleged to have allowed the injury to happen. Here, in contrast, the defendants complain only about the conduct of Ahrens.

In *Board of Public Educ.*, the insurer provided coverage to the School District of Pittsburgh for claims based on negligent acts but excluded coverage, in pertinent part, for claims arising out of (1) assault or battery, or (2) bodily injury. 709 A.2d at 913-14. The plaintiff in the underlying action, a student at a middle school sued for civil rights violations committed by the president of the school's parent-teacher organization when he allegedly sexually molested the student. *Id.* at 911, 913. The student made allegations against the Board of Education, the School District, and the middle school's principal for negligence in supervision, control and hiring in connection with the president of the parent-teacher organization. *Id.* at 913-14. The latter was also sued, a claim charging him with the intentional conduct of battery. *Id.* at 913 n.3.

The insurer refused to defend or indemnify, citing the two exclusions listed above (and a third one the defendants do not rely on). The trial court agreed. On appeal, the superior court rejected the insurer's position. The court first noted that there was no exclusion "for negligent supervision, control, or hiring, or for civil rights violations." *Id.* at 914. Speaking about the first exclusion and then applying the rationale to the second one as well, the superior court stated:

> The injuries arise, according to the pleadings to which we are restricted, from the School District's negligent acts and omissions; the omissions and negligence (the "claim") did not arise from the molestation. That is, [the president's] acts "arose out of" the failings of the School District, not the other way around. . . . Likewise, [the president's] acts alone do not create or give rise to a claim against appellants; that claim cannot stand on allegations of assault alone. It arises, if at all, from other facts, grounded in negligence.

12

*Id.* at 916. The court thus held that the insurer at least had a duty to defend the School District insureds.[4] *Coregis Ins. Co.* is the same type of case. There the court held that the plaintiff insurer had a duty to defend Dauphin County against claims that it was negligent in training and supervising employees, thereby allowing them to commit intentional acts (excluded from coverage under the policy) violative of a criminal defendant's civil rights. Relying on *Board of Public Educ.*, the court stated: "Construing the policy against Coregis, the Court cannot read these exclusions to preclude claims of negligence against Dauphin County simply because another tortfeasor allegedly committed an otherwise excludable tort." 2005 WL 2179734, at *12.

Based on these cases, the *Wagner* plaintiffs argue that their claims do not fall within the exclusion. They do so by separating their allegations of Ahrens' negligence from his solicitation, just as the superior court separated the School District insureds' negligence from the intentional conduct of the president of the parent-teacher organization. Thus, they argue that the solicitation alone, "the initial intentional, potentially excluded contact by Ahrens," did not lead to the loan transactions, but Ahrens' later negligence in giving his approval that the loans be made. (Doc. 49, Supp'n Br. at pp. 12-13). And they conclude: "Ahrens' failure to investigate Madiera and his inaccurate statements about Madiera's uses of the funds are more properly the 'but for' causes of . . . Defendants' injuries, not any solicitation by Ahrens." (*Id.* at p. 13).

The defendants' reliance on *Board of Public Educ.* is misplaced. It is true that the court did say it was "restricted" by the state-court complaint to accept that the

---

[4] The president might have been an insured as well, but his status as an insured was not material to the court's disposition.

13

student plaintiff's injury arose from the insured's negligence, and not the molestation. However, its conclusion that there was coverage depended on the fact that a third party had committed the acts that were subject to the exclusion while the School District insureds' liability would "arise[ ], if at all, from other facts, grounded in negligence." 709 A.2d at 916. The significance of a third party committing the excludable conduct is made clear later in the opinion when the superior court stated:

> The allegations against the School District were of negligence and violations of the student's constitutional rights. While there was a criminal act and an assault or battery here, that was not the act of the School District. To deny the School District a defense against claims that do not allege excluded conduct by the District would be intolerable.

*Id.* at 917.

Unlike in *Board of Public Educ.* and *Coregis Ins Co.*, there is no third party here who committed the excludable act. The insured Ahrens is alleged to have solicited and sold the investments and to have been negligent in failing to investigate the Healys and in his misrepresentations about the investments. Contrary to the defendants' argument, we thus correctly relied upon *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 612, 735 A.2d 100, 110 (1999), and *McCabe v. Old Republic Ins. Co.*, 425 Pa. 221, 228 A.2d 901 (1967), in concluding that the defendants' claims arose out of the solicitation or sale of specific investments and are therefore not covered under the policy. 2010 WL 1994181, at *4 and 6. *See also Triche v. St. Paul Guardian Ins. Co.*, 2009 WL 3452757, at *5 (La. App. 1st Cir. 2009); *Bullis v. Minnesota Lawyers Mut. Ins. Co.*, No. 06-102, 2007 WL 4353760, at *6 (D.N.D. Dec. 10, 2007).

IV.  *Conclusion*

　　　Based on the foregoing, we will deny the defendants' motion to alter or amend.  The defendants requested oral argument, but oral argument would not assist the court in resolving the motion as the parties have fully briefed the issues.

　　　　　　　　　　　　　　　　　　/s/William W. Caldwell
　　　　　　　　　　　　　　　　　　William W. Caldwell
　　　　　　　　　　　　　　　　　　United States District Judge

Date: October 8, 2010

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MINNESOTA LAWYERS MUTUAL :
INSURANCE COMPANY
    Plaintiff :

               :
    vs.                CIVIL NO. 1:CV-09-1661
               :

THOMAS J. AHRENS, Esquire, :
AHRENS LAW FIRM, P.C.,
DAVID E. RICKER, RANDALL WAGNER,:
JOHN JARBOE, LARRY L. HATTER,
JAMES J. GREEN, SR., :
KEITH HOSTLER, ANGELA HICKEY,
ORREL E. PICKLESIMER, Executor :
of the Estate of Edsel Picklesimer,
MARK RANDALL, NEIL BARR, :
    Defendants

*O R D E R*

AND NOW, this 8th day of October, 2010, it is ordered that the motion (doc. 48) to alter or amend the order of May 18, 2010, filed by defendants, Randall Wagner, John Jarboe, Larry L. Hatter, James J. Green, Sr., Keith Hostler, Angela Hickey, Orrel E. Picklesimer (Executor of the estate of Edsel Picklesimer), Mark Randall, and Neil Barr, is denied.

                                                          /s/William W. Caldwell
                                                          William W. Caldwell
                                                          United States District Judge